UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 CR 50020 |
| | ) | |
| TERRENCE E. BRUCE, | ) | |
| ALEXANDER M. KLEST, | ) | |
| MARTIN W. MARTINO, | ) | |
| ABBY D. KLEST, and | ) | |
| PAMELA A. MESSMAN, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

FREDERICK J. KAPALA, District Judge:

Defendants Terrence E. Bruce, Alexander M. Klest, Martin W. Martino, Abby D. Klest, and Pamela A. Messman, are charged by indictment with conspiracy to defraud by producing and using counterfeit access devices, specifically counterfeit Universal Product Code (UPC) stickers, in attempts to purchase retail products at less than full retail price in violation of 18 U.S.C. § 1029(a)(1) and 371. Before the court is Messman's Federal Rule of Criminal Procedure 12(b)(3)(B) motion to dismiss the indictment as insufficient to state an offense. Messman contends that a UPC sticker is not an "access device" as defined by 18 U.S.C. § 1029(e)(1). The other four defendants have joined in the motion which has been fully briefed. The court held a hearing on the motion and now grants the motion to dismiss the indictment.

## I. FACTS

It is alleged in the indictment that defendants committed or caused to be committed the following overt acts in furtherance of the conspiracy:

> (a) On or about October 20, 2006, at the Wal-Mart located at 3849 Northridge Drive, Rockford, Illinois, defendants attempted to purchase several Bernzomatic torches with a counterfeit Universal Price Code sticker that had a price less than the full retail value of that product.
> (b) On or about March 19, 2007, at a Wal-Mart store located in Waukegan, Illinois, defendants attempted to purchase several chlorine pool products with a counterfeit Universal Price Code sticker that had a price less than the full retail value of that product.

Through proffer and presentation of the affidavits and other materials attached to the government's response to defendant's motion, the court has learned that UPC bar codes are used by virtually every large retailer utilizing a point-of-sale system where products being purchased are scanned at the register. A UPC bar code affixed to a retail product contains three pieces of information: the manufacturer's Uniform Commercial Code membership identification number, the product's identifier number, and a calculated check digit to ensure that the scanner reads the code correctly. The three numbers taken together constitute the Global Trade Item Number. The UPC bar code does not contain the name or description of the product, the price of the product, or any details about the product. The UPC bar code is meaningless unless it is linked to a store's product database. When a product is scanned, the product's identification number is compared to the product identification numbers in the store's product database and information such as manufacturer, product name, product description and price is used to complete the sale of the product.

In the case of Wal-Mart, each item's price is set by Wal-Mart's home office in Bentonville, Arkansas. A newly revised product database is uploaded from Wal-Mart's home office to every Wal-Mart store every evening at 6 p.m. Central Standard Time. While this upload is occurring, an

inventory update is submitted from each Wal-Mart store to the home office indicating how many items of each product have been sold by the store and future shipments to each store are adjusted accordingly.

Affiant Christopher Ferguson, a Specialist in Point of Sale Store Strategies employed by Wal Mart Corporation in Bentonville, Arkansas, stated the following:

> When a product's UPC barcode is scanned at a Point Of Sale (POS) register, it looks up the product's information on a product database at the store to determine the cost, retail sale amount, taxes, etc. After the product is purchased, the product's information is recorded as being sold in various systems across the country including Bentonville, Arkansas. Adjustments are made to multiple accounts based on the information that a physical product has left a store. For example, the amount of sales (i.e., income) is increased with regards to financial accounts, the amount of taxes is increased with regards to tax accounts, the quantity of the product is decreased with regards to inventory accounts, etc. Therefore, an incorrect barcode on a product would lead to incorrect adjustments being made to accounts (i.e., an out-of-balance).

Affiant Rob Ash of Target Corporation made an almost identical statement in his affidavit regarding the effect of the use of an incorrect UPC bar code at a Target point-of-sale register. The government also attached documents showing that any alteration of the UPC bar codes on products for sale at Meijer stores from the originally intended UPC will upset the balance between the receiving, inventory, and replenishment systems resulting in accounts displaying stock loss.

## II. ANALYSIS

The court begins its evaluation of defendants' motion to dismiss the indictment with an examination of the language of the relevant statutes. Section 1029(a)(1) provides:

> (a) Whoever-
> (1) knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices; . . .
> shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

18 U.S.C. § 1029(a)(1). The terms "access device" and "counterfeit access device" are further defined as follows:

> As used in this section--
>
> (1) the term "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);
>
> (2) the term "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device;

18 U.S.C. § 1029(e)(1)-(2).

"An indictment is legally valid if it: '(1) states all the elements of the crime charged; (2) informs the defendant of the nature of the charge, enabling the defendant to prepare a defense; and (3) enables the defendant to plead the judgment as a bar to later prosecution of the same offense.' " United States v. Abu-Shawish, 507 F.3d 550, 553 (7th Cir. 2007) (quoting United States v. Allender, 62 F.3d 909, 914 (7th Cir. 1995)).

Defendants contend that the indictment is insufficient to state an offense because the use of counterfeit UPC bar codes do not fall within the ambit of § 1029(a)(1). Specifically, defendants argue that UPC bar codes are not "access devices" as defined by § 1029(e)(1) because they do not access an account of the alleged victim. The government disagrees, maintaining that when the counterfeit UPC bar codes were scanned at the point-of-sale, the retailer's formal accounting system, which is a record of credits and debits, is accessed thereby causing substantial losses to the retailer's

4

bottom line.[1]

The parties agree that a UPC bar code is a "code" as enumerated in § 1029(e)(1). The parties also agree that the purported "access device" must access an account. See United States v. Blackmon, 839 F.2d 900, 913-14 (2d Cir. 1988) (holding § 1029 inapplicable to use of credit cards as "false identification in connection with frauds upon victims who were neither the owners nor the issuers of the cards," where account was never accessed). The parties are at odds as to whether the counterfeit UPC bar codes allegedly produced and used in this case qualify as a "means of account access" under § 1029(e)(1). The parties have not cited any reported case addressing whether a counterfeit UPC bar code meets the definition of "access device," and this court has located none[2]. Nor have the parties directed the court to any Seventh Circuit authority interpreting or construing the term "access device." Other circuits, however, have addressed the meaning of the term in other contexts. A discussion of these authorities is instructive.

The defendant in United States v. Brady, 13 F.3d 334 (10th Cir. 1993), was engaged in the practice of "free riding" cellular telephone service by "tumbling" cellular telephones. Id. at 336. Tumbling involves modifying the chip that holds the mobile identification number (MIN) and the

---

[1] Ordinarily the sufficiency of an indictment should be decided solely by the charges made in the indictment. United States v. Risk, 843 F.2d 1059, 1061 (7th Cir. 1988). The instant case, however, presents a situation where the government has acquiesced in this court's consideration of whether the undisputed facts state a violation of law, and it is therefore proper to consider undisputed facts beyond those stated in the indictment. See id.

[2] The government maintains that the Second Circuit in United States v. Sash, 396 F.3d 515 (2nd Cir. 2005), upheld convictions resulting from a plea of guilty to unlawful production of identification documents in violation of 18 U.S.C. § 1028(a)(1), (b)(1)(B), and a violation of § 1029 involving the possession of UPC bar codes for the purpose of fraud. However, the government concedes that the defendant in Sash appealed his sentence and not his conviction of the § 1029 offense such that the defendant did not directly challenge the UPC bar code fraud scheme. Sash, therefore, does not aid the court in ruling on the instant motion to dismiss the indictment.

electronic serial number (ESN)[3] of a cellular telephone to allow the user to change or tumble the MIN/ESN combination to make free calls until the invalid combination is detected. Id. At the hearing before the district court on the defendant's motion to dismiss the indictment, the government conceded that it could not prove that the defendant actually accessed identifiable subscriber accounts, and the district court dismissed the indictment. Id. at 337. The government appealed arguing that the district court erred in concluding that a tumbling cellular telephone, used or transferred to another for purposes of free riding on the telephone system, is not an "access device" within the meaning of § 1029. Id. The Tenth Circuit rejected this argument and affirmed, concluding that the government had not established that tumbling cellular telephones was a means of account access because the practice "does not debit a legitimate subscriber's account, nor does it trigger the creation and maintenance of a formal record of credits and debits." Id. at 339. The Court noted that expanding § 1029 beyond those instances in which an identifiable account is accessed would "turn § 1029 into a general theft statute applicable whenever a company can document a loss through fraud." Id. at 340.

The Brady court relied primarily on United States v. McNutt, 908 F.2d 561 (10th Cir. 1990), a case involving the free riding of satellite television service. The defendant in McNutt was convicted of conspiracy to possess, manufacture, assemble, or sell descrambler modules with cloned electronic addresses taken from signal descramblers assigned to legitimate programming accounts.

---

[3]The district court defined these terms as follows: "ESN-Electronic Serial Number-a unique numerical code embedded in each cellular telephone by the manufacturer identifying that particular instrument. The first two digits of the eight-digit ESN code identifies the manufacturer, e.g., an '86' prefix indicates a cellular telephone manufactured by Mitsubishi," United States v. Brady, 820 F.Supp 1346, 1348 n.2 (D. Utah 1993), and "MIN-Mobile Identification Number-a ten-digit numerical telephone number (area code + seven-digit telephone number) assigned to each cellular telephone customer, usually identical to the customer's home telephone number," id. at n.3.

Id. at 562. In this way, several illegitimate descramblers had the same electronic address as the legitimate descrambler. Id. at 562-63. As long as the legitimate customer account was maintained, owners of the cloned descramblers could watch satellite television for free. Id. at 563. In concluding that the cloned electronic addresses on satellite television descrambler modules were not an unauthorized "means of account access" under § 1029, the McNutt court reasoned that defendant's scheme "[did] not debit legitimate subscribers' accounts," but rather, caused the "operators of satellite televison services [to] suffer <u>economic</u> losses from the revenue forgone . . . ." Id. at 563-64; see also United States v. Morris, 81 F.3d 131, 134 (11th Cir. 1996) (noting in dictum that § 1029 should not be extended beyond "devices which access an individual account").

Other cases have construed the term "account," to which the access device must be a means of access, more expansively than Brady and McNutt, these authorities nevertheless retain the contractual-relationship element in their definition. For example, in United States v. Bailey, 41 F.3d 413 (9th Cir. 1994), another case involving tumbling cellular telephones, the Ninth Circuit held that:

> it seems unlikely that Congress was worried about the literal numbers on a ledger; instead, the purpose of the statute is to deal with the abuse of new technologies that increasingly allow individuals and businesses access to goods and services without immediate payment by cash or familiar, paper instruments. When the statute refers to 'account access,' it evidently means access to the privileges permitted by virtue of the maintenance of an account . . . . In other words, <u>an account is a contractual relationship that makes possible the provision of goods, services, or money based on payment, or the expectation of payment, at some later point in time, as described by the entry of credits and debits in a formal record</u>.

Id. at 417 (emphasis added).

The Sixth Circuit in United States v. Ashe, 47 F.3d 770 (6th Cir. 1995), held that "invasion of an identifiable customer's account is not a necessary element of proof," but still concluded that the account accessed was a preexisting agreement that was debited:

7

> To prevail, the government need only prove by the appropriate weight of the evidence that the defendant possessed, produced, trafficked, had control over, or had custody of an instrument or device (or device-making equipment) that permits a theft of services. Because preexisting agreements and practices within the inter-telephone carrier network require a MIN-identified home carrier to reimburse a foreign carrier for the air time incurred by either a valid subscriber or an illicit "roamer" identified by a transmitted MIN and ESN combination that actuated access to the inter-cellular telephone network, a fraudulently identified ostensible home carrier ultimately assumes the loss of the unidentified "free rider" call which was debited to its account as a result of the counterfeit MIN/ESN identification combination.

Id. at 774. The Ashe court explained further that the fraudulent tumbling of MIN/ESN combinations "enabled the user to raid an 'account' within the system, albeit a fictitious or unassigned customer account. The perpetrator successfully stole value through the artifice of invented account codes which deceived the system by rendering the impression that an existing, valid customer account was being accessed." Id. at 774 n.10 (emphasis removed); see also United States v. Sepulveda, 115 F.3d 882, 884-86 (11th Cir. 1997) (concluding that fourteen "cloned" cellular telephones programmed to charge unauthorized calls to subscribers' accounts and four unprogrammed numerical combinations corresponding to additional accounts were access devices); United States v. Taylor, 945 F.2d 1050, 1051 (8th Cir. 1991) (holding that misuse of valid but yet to be assigned American Express credit card account numbers, together with fictitious names, to fraudulently obtain goods and services constitutes an access device); United States v. Brewer, 835 F.2d 550, 552-54 (5th Cir. 1987) (concluding that misappropriation of unassigned long distance telephone access codes to obtain unauthorized services is covered by § 1029).

The government argues that when a UPC bar code is scanned at a point-of-sale register, the retailer's inventory account for the product corresponding to that particular UPC bar code is debited and the retailer's income account is credited with the corresponding price. When the UPC bar code is counterfeit, the retailer's inventory account is debited for the wrong product and its income

account is credited with less than the actual product price. The government argues further that when fraudulently purchased products are returned, the retailer's income account is debited for the actual retail price of the returned products with a corresponding loss to the retailer of the difference between the actual retail value of the products and the price actually paid for the products through the use of the counterfeit UPC bar code. The government also contends that use of the counterfeit UPC bar codes access the retailer's tax accounts.[4]

The government refers to the retailer's internal income, inventory, and tax records as "accounts" and, in the broad sense of that term, they qualify as such. See Merriam-Webster's Online Dictionary, http://www.m-w.com/dictionary/account (last visited Jan. 22, 2008) (defining "account" as "a record of debit and credit entries to cover transactions involving a particular item or a particular person or concern . . . a statement of transactions during a fiscal period and the resulting balance"). The foregoing authorities, however, have construed the "account," to which the purported "access device" must be a means of access under § 1029(e)(1), as both a formal record of credits and debits and a contractual relationship. This definition is consistent with an alternative common understanding of the definition as a on-going contractual relationship. See id. (also defining "account" as a formal business arrangement providing for regular dealings or services (as banking, advertising, or store credit) and involving the establishment and maintenance of an account"). The government does not explain how the retailer's internal inventory, income, and tax accounts meet the contractual relationship portion of the definition. Nor does the government maintain that the retailer's unilateral internal income, inventory, and tax accounts constitute "valid

---

[4]The government does not argue that defendants' production or use of the counterfeit UPC bar codes were a means of access to any account the retailer maintains with suppliers or wholesalers of retail products.

identifiable accounts" of the retailer's customers. None of the cases cited by the parties or uncovered by this court hold that the account to which the purported access device is a means of access can be a unilateral, internal accounting record of a business, as opposed to an on-going, or contemplated, contractual relationship between two or more entities. Therefore, the court holds that the UPC bar codes produced and used in the fashion alleged in the indictment are not a means of access to an account as that term is used in § 1029(e)(1).

The government also calls into question the weight to be afforded to <u>Brady</u> because the court was construing an earlier version of § 1029(e)(1). The <u>Brady</u> court, as well as the courts in the other authorities discussed above, construed an earlier version of § 1029(e)(1) that did not include "electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier" in the specifically enumerated types of access devices. <u>See</u> Pub. L. No. 103-414, 108 Stat. 4279 (codified as amended at 18 U.S.C. § 1029(e)(1) (1994)). The amended version of the statute, which is applicable to the instant case, does not alter the definition of the account stated in <u>McNutt</u>, <u>Brady</u>, <u>Bailey</u> and <u>Ashe</u>. The specifically enumerated types of access devices, including codes, must still be "means of account access" even after the amendment of § 1029(e)(1). Moreover, post-amendment cases also involve accounts meeting the debited and credited ongoing contractual relationship definition. <u>See, e.g.</u>, <u>United States v. Abozid</u>, 257 F.3d 191, 196-97 (2nd Cir. 2001) (applying the <u>Bailey</u> definition of account as "a contractual relationship that makes possible the provision of goods, services, or money based on payment, or the expectation of payment, at some later point in time, as described by the entry of credits and debits in a formal record" and holding that a credit relationship between an airline and a travel agency satisfies the "account access" requirement in § 1029); <u>United States v.</u>

Dabbs, 134 F.3d 1071, 1080-81 (11th Cir. 1998) (holding that merchant account numbers used to access funds from credit sales drafts are access devices).

## III. CONCLUSION

In sum, the government has failed to allege an essential element of § 1029(a)(1), the offense defendants are charged with conspiring to commit, because the purported access devices, counterfeit UPC bar codes produced and used in the fashion alleged in the indictment, are not means of access to the type of account contemplated by § 1029(e)(1). Consequently, the indictment does not state an offense against the United States and is dismissed pursuant to Rule 12(b)(3)(B).

ENTER:

_____

FREDERICK J. KAPALA
District Judge

Date: January 23, 2008